Our first case, Teleguz v. Zook, number 11-9. Mr. Williams? Good morning, Judge Motts, and may it please the Court? Mike Williams from Kirkland & Ellis. On behalf of Petitioner Yvonne Teleguz, I've reserved ten minutes of my time for rebuttal. Your Honors, this is the case where Defense Counsel, during a capital murder trial, elicited from another witness evidence of a murder, inculpating the petitioner, that never occurred. The prosecution tried to clean that up on redirect so that the defendant wasn't the shooter in this fictitious murder, but was somebody who was involved in arranging it. And then the prosecutor seized on this evidence, a murder that did not occur, as her lead argument in support of future dangerousness, that is that this petitioner was too dangerous to receive life in prison. Now, we've raised substantive habeas claims about these serious problems in the District Court, and he found that these claims were defaulted. On appeal, Your Honor, and to the District Court, we've presented two independent reasons that the District Court should have reached the merits of these substantive habeas claims. The first is petitioner's showing of actual innocence under Sloop v. Dello, and the second was ineffective assistance of state post-conviction counsel under Martinez v. Ryan. Now, unless the court would like me to handle this argument in a particular way, I'd like to turn first to Martinez v. Ryan, because it wasn't addressed by this court earlier, and this court has gone over the actual innocence claims in some detail, but I'm happy to take it however Your Honors would prefer. Well, I'm not sure that addressing that by the District Court or by you on remand was within the remand rule, within the mandate rule. Maybe you want to speak to that. I would, Judge Motz, because as Your Honor points out, the District Court held that the Martinez v. Ryan arguments were not... It's our decision that controls what's within the mandate rule, right? Yes, Your Honor, and indeed, I'll note first, even the warden in its opposition brief in this case didn't say that this was beyond the scope of the mandate rule. I'm just going to say it one more time. We decided, and it's our prior decision that this court did rule that the District Court should address any of these non-defaulted claims, or in finding that the fault was excused, that it should turn to all of these claims on remand. I'll note that Mr. Teleguz did preserve his Martinez argument before this court, first in his initial brief, and then in his reply brief. Don't we have to find a window into, or they don't call it a window, a window into the You can do it any way you wish, but I was just suggesting maybe the other argument logically goes first. Well, Your Honor, I'd like to handle it logically then, and we'll turn to that showing under Schlup versus Bellow. And in that on remand in the District Court, we presented the affidavits of two of the three people who testified against Mr. Teleguz at his trial. We tried to bring those people for cross-examination to the hearing as well. These people, we presented three categories of evidence. First, these recantations themselves, that is of the people who inculcated Mr. Teleguz, leading to his death sentence. Can I ask you, first of all, about the hearing? As I read our first opinion, and as I remembered it, because you have the beauty of the same panel here, the essential argument that you made was that you needed a hearing. And we sent this back, not requiring a hearing, but suggesting that that would be a very good idea. You get back to the District Court, you say, we don't want a hearing. And as I remember, and you can correct me wrong if I'm wrong, I was under the impression that these two recanting witnesses were going to testify. Yes, Your Honor. And to answer both of your questions, we did argue at the District Court on remand that the record was clear enough that the relief could be granted even without a hearing. I think the whole argument in front of us to get the remand was that you needed a hearing. And, Your Honor, at that point, when we had the hearing, Your Honor, we presented all the evidence that we could. I understand that, but then you certainly did it in about faith, and I just wondered what changed? And, Your Honor, with that said, I wasn't involved in that particular argument. I do, just from reading the transcript, I do know that the thought was that our arguments were strong enough that the District Court could have granted the writ on the record that was sent back down based on this Court's opinion. As for the second point, Your Honor, in having these witnesses testify. Before you finish that one, could it have been that you knew that the witnesses were not going to come? Your Honor, it's not that we knew that the witnesses were not going to come, because many of our witnesses did come. We brought Edwin Gilch to testify, and he pleaded the Fifth Amendment from the moment that we asked him his name. We sought out Sophinoff, and we brought, as the record shows, more than 10 different witnesses and different categories of evidence that go not just to the recantations, but corroborating evidence to that recantation, Your Honor. Is it your representation to us that you didn't know that the two witnesses that were going to recant were not going to be available for testimony? Yes, Your Honor, that's exactly my representation, and that's why we called. That's very unusual. I mean, you sound like you're a trial lawyer. Usually one knows, usually the lawyers know what's going to happen. Well, Your Honor. At least whether the witness will testify or not. Not what the witness will say, God knows, but what the witness will testify, whether it will testify or not. Your Honor, we intended that this would be a full-bore hearing, according to Your Honor's initial attempt. Okay, but you didn't want a hearing. That's why I find the whole record very odd. But Your Honor, as soon as we were granted that hearing, we asked for discovery, we marshaled our evidence, we brought witnesses, and if I could turn to these three categories of evidence, I think that will explain why it was unclear. Not every lawyer who moves to summary judgment is thereby giving up the opportunity for trial. I mean, is that essentially what it amounted to? You thought you were going to win. We thought we were going to win, Your Honor. And you thought you were more likely to win from this judge without a hearing than with one. Judge Davis, I think you hit the nail right on the head. But the odd thing is that your whole, your number one argument in front of us was you needed a hearing. And Your Honor, as I say, I understand that that's odd. And we had the hearing. We did marshal this evidence at the hearing. We ran into procedural issues in terms of getting discovery that we think we were entitled to and that we needed. We put on three categories of evidence. And if I can turn to those categories of evidence, I think it shows that Mr. Teleguz did establish that there's sufficient doubt about his guilt in the underlying trial that that state conviction proceeding should have been pristine. And I think as this panel acknowledged before, there were serious errors that leaped right off the page about what happened at a state conviction proceedings. And the first category of that evidence, Your Honor, was the recantations themselves. Now, we weren't just going through the motions, Judge Motz. We arranged for Edwin Gilkes to be transported to trial. We tried to have him testify. And importantly, Judge Motz, he was also available for the Commonwealth's counsel to question. That is, even if there was this insinuation by Commonwealth's counsel that Mr. Gilkes would have put himself in testimony by confirming his recantation, that is, he would have endangered his plea deal, he would have subjected himself to a capital prosecution, that wouldn't have been the case if the state's counsel had asked him questions and said, was your trial testimony true? Or, following up on this panel's opinion the first time, was your recantation the product of bribery, coercion, or any other misdealing? So, Your Honor, he pleaded the Fifth, and it's unfortunate that he did. It was a disappointment, but we weren't just going to. He didn't know that he was going to. His lawyer didn't say, don't call my man because he's going to plead the Fifth. Your Honor, he didn't say, don't call my man because he's going to plead the Fifth, but he said he was going to have to talk with his counsel, which is what I'd expect counsel to say after counsel was appointed at the warden's insistence and over our objection, Your Honor. We also brought other categories of evidence that couldn't have pleaded the Fifth. That is, other facts that supported Mr. Gilkes' recantation. We brought forward statements and live testimony about this supposed Eberhardt birthday party. And it was central to the hired Mr. Hetrick at this birthday party. We submitted affidavits showing that Mr. Telugu's, according to the birthday party, the owner of the home where the party took place, his girlfriend, and two other people, that Mr. Telugu's wasn't present at that party. Now, this is the sort of evidence where the district court reviewing it sort of took it apart piece by piece. And when he couldn't dismantle it, he said it wasn't central to the prosecution's theory. And therefore, I don't think it wouldn't have made an impact on the jury. But the cumulative impact of all this evidence, Your Honor, the fact of the recantations, the recantations themselves, the corroborating evidence, all of this is what leads to the showing that Mr. Telugu's was actually innocent. Or at least there's enough of a showing here that his state court proceedings should have been without a serious constitutional error. Now, by way of the affidavits, and when I talk about the district court's analysis, this court has already seen Mr. Gilkes' two affidavits recanting his testimony. I'd say that Mr. Gilkes' recantation, notwithstanding the fact that he pleaded the fifth in response to my questions, is some of the most powerful evidence in support of Mr. Telugu's innocence that exists in this case. Because Mr. Gilkes said not only what I said at trial was false, the reasons I gave false testimony was because I was pressured by the prosecutor. The pressure from the prosecutor was that if I didn't help her, I would be facing a death penalty in a conservative district of Virginia that would be impossible to overturn. But he also gave specific facts that undercut his trial testimony. Now, the district court, by its own admission, put this affidavit to the side. He said, I'm going to give it little or no weight. But all of the reasons for discarding Mr. Gilkes' affidavit appear on page 23 of the district court's opinion. And they include the following three points. First, Mr. Gilkes didn't offer an alternative explanation why he was involved in the murder. Second, he didn't say who drove to Pennsylvania. And third, he didn't say, and I apologize for this, Your Honor, but Were all the reasons argued by the Commonwealth? All of the reasons were argued by the Commonwealth, Your Honor. And the third reason was that Mr. Gilkes didn't say how he ultimately located site. And the reason I turned to this reason is in terms of a clear error review of the district court's factual findings, that first and really central reason that Mr. Gilkes' affidavit was deemed unreliable by the district court is simply not true in this record. The district court said, Mr. Gilkes failed to say why he and Hetrick traveled to Harrisonburg to murder site. But in paragraph 21 of his 2010 affidavit, Mr. Gilkes said, Mr. Hetrick told me that we were going to do a drug run in Virginia, and therefore I traveled with him. District court didn't mention this fact, didn't talk about how it would bear on the credibility of Mr. Gilkes as a witness. And these sort of factual errors, Your Honor, really affect the district court's analysis of Mr. Teleguz's actual innocence claims. The other two aren't factual errors, are they? They're interpretive errors. Your Honor, I'd say that there are interpretive errors, there are specific factual errors, and then there's the broader legal error in the district court's analysis, which is that under Schlup versus Dallow, and under Judge Mons, this court- But what I mean is, and it's a small point, but Gilkes didn't say who drove to Harrisonburg. That's not a finding. I mean, that's not an error. He didn't. The affidavit doesn't say who drove. That's right, Your Honor. It's the sort of problem, I think, with this opinion where, you know, going to the Schlup analysis, the district court put a burden on Mr. Teleguz that's unprecedented in the law and was really unsuitable here. During the Schlup hearing, the court's instructions were clear. You have recantations. How's a judge supposed to handle an invocation of the Fifth under these circumstances? Well, Your Honor, I think in a standard civil case, what a judge would do- Which this is not. Which this is certainly not, but in a standard civil case, a court typically holds the absence of evidence against the party who's responsible for procuring its absence. Now, we've argued that the warden is responsible for the procuring the absence in this case. I saw the district court observe that maybe it was Mr. Teleguz that pushed Mr. Gilkes in jeopardy by having him even- by even asking him for a recantation. Do we know anything about the circumstances surrounding petitioners obtaining of the affidavits from Gilkes and what, if anything, the Commonwealth did around that or thereafter? What do we know? What does the record show, if anything? We do know, Judge Davis, because at the hearing, the Commonwealth tried unsuccessfully to impeach these affidavits by suggesting- by presenting evidence suggesting that there was some sort of misdealing in their procurement. The Commonwealth presented the testimony of somebody who works at the prison phone record system to show that Mr. Gilkes and representatives of the Virginia Capital Rights Resource Center had a series of phone calls leading up to the affidavits. That much is obvious. And, Your Honor, that was the extent of the Commonwealth's evidence. So, whereas this court in Teleguz 1 said, are these affidavits credible or were they the products of coercion, bribery, or misdealing? The Commonwealth tried to show that, but in the end couldn't. I think part of the reason this is important, Judge Davis, isn't just for the substance of Mr. Gilkes' affidavit, but for the fact that he gave these affidavits at all. He's a man, unlike Safanov, who's in Kazakhstan and we did what we could to try to bring him, but Mr. Gilkes is actually set to be released from prison in three years. The Commonwealth didn't, it wouldn't be permitted, would it, under standard sort of ethical and professional norms to actually call the investigator? To call the investigator who spoke to Gilkes. Under Rule .423 of the Rules of Professional Accounts, I don't believe that they could, but again, Your Honor, this is the sort of problem where if we had full discovery, if we were allowed to develop our record, we were asking for discovery. In fact, that Your Honors are probably going to question me about. The Commonwealth could have asked for discovery as well, and had we done this through normal channels and were able to build out our factual record, we'd have answers to questions like that, and the Commonwealth would have been able to build their case as well. I'm sorry. Go ahead. I think the bottom line with Mr. Gilkes, as I was saying, is he's a person who has no professional stake. He's got no financial incentives to do anything for Mr. Teleguz. Well, he kind of does, doesn't he? Because if I understand the record, what the Commonwealth is saying is, if you support this petition along the lines of your affidavit, Teleguz may get out from under a death penalty, a death sentence, but you sure are going to be facing one. That's a personal stake. I should have said no stake in supporting Mr. Teleguz, Judge Davis. You're absolutely right, and I think that makes an even stronger argument. Mr. Teleguz has no... Mr... I'm sorry, Judge Ma? No, I just wanted you to... You were just about to, a few minutes ago, talk about the standard here, because I think that it's the standard that's difficult for me to understand, but I think one gets from Schlup and House that no reasonable juror would find him guilty beyond a reasonable doubt, or that it's more likely than not that any reasonable juror would have a reasonable doubt. Now, does this mean that we have to find that every reasonable juror would vote to acquit on the basis of this new evidence? I don't think so, Your Honor. Well, what does it mean? If it's phrased as no reasonable juror would have been able to convict beyond a reasonable doubt... That's a quote. That is the quote, Your Honor, and so with that said... No, it says no reasonable juror could, so it seems to me that we have to find that there is no reasonable juror that can convict. I understand that that's a quote from Schlup, Your Honor. I know that in the practicalities... What else are we supposed to rely on? The Supreme Court says what the standard is, we generally follow along. No, and I understand that, but as a practical matter, if there were holdouts on the jury, there wouldn't have been a conviction, and therefore, it would have made a difference. I do understand that's the Supreme Court standard, and of course, I'd say the Fourth Circuit needs to follow the Supreme Court standard, but I'll also note that I don't think the District Court followed that standard at all, Your Honor. I'm asking what we're supposed to do now on the basis of your argument. And, Your Honor, the answer is no reasonable juror. If that's what the Supreme Court said, that's the standard. Okay. Can we turn, if it's okay with my colleagues, to the Martinez issue? How did the Martinez issue come into the case? The Martinez issue first came into the case before Martinez was decided in 2012. Mr. Teliger's dropped the reference in his first appellate brief that even though this is probably foreclosed, we'd like to preserve it, and then he repeated that argument in the reply brief. We did not mention it in the last argument to this Court, but with that said, we tried to preserve the argument at every step along the way. And the District Court acknowledged that it was in the case. The District Court acknowledged that it was in the case, but then held that it was beyond the scope of this Court's mandate during the hearing on remand. And that's the only reason the Court didn't give you a hearing on it. That's correct, Your Honor. There were two points there, Your Honor. The first is we asked the District Court for a full hearing at the start of the argument. Was Martinez decided after argument in this case or just before? Just before argument. Just before. I believe that the chronology is March of 2012. Martinez was decided May of 2012. This Court heard argument. So there were about two months.  Yes, Your Honor. It was our first opportunity to acknowledge the impact of Martinez and Thaler. That's correct, Your Honor. And so Telgus had viewed himself as always having some live Martinez claim. When we went back down to the District Court, we asked the District Court to present argument and evidence in support of our Martinez claim. The warden objected, and the District Court said, I'm not going to allow you to put on that evidence. Did you argue that this is a classic exception to the mandate rule? When the law evolves. That is miscarriage of justice, we argued. And as the warden in their opposition brief acknowledges, they're not even taking the position that this was outside of the mandate rule. They claimed the error wasn't prejudicial. The District Court did ultimately consider the Martinez arguments, but he did so with this gloss that he was doing so only to prevent a miscarriage of justice. Now, say, I think in the- Let me ask you a question regarding, let me get back to the hearing itself. When we sent this back, we strongly suggested the evidentiary hearing. The court did so. And now, essentially what you are asking us to do is to say, well, the credibility determination should be thrown out. There was an Ebenhardt deposition that suggested that the defense counsel had asked her to lie and affidavit. And they in fact did testify to the fact that they were not at the parties. How, in light of the standard that Judge Motz articulated from the quote there, how do we do that in this instance? I mean, as troubling as this may be with the recantations by the affidavits, the witnesses won't come. It's a credibility determination. How do we do that now? Well, Judge Wynn, I think it's two points. The first is it's not just credibility determinations, but other factual findings. And I understand under Angelone, the court reviews those factual findings for clear error. But I think there are factual findings that are clearly erroneous under the state of the record. For example, the finding that Gilks didn't say have an alternative explanation for killing Stephanie Seif, when in fact it's clear from the record as I cited that he provided that alternative explanation. The district court simply didn't mention it or address it. On the second point, Judge Wynn, just a point of clarification, Letitia Eberhardt didn't say that defense counsel asked her to lie. She said in was false. And I think this actually demonstrates part of the problem that we've had with the hearing. We had an affidavit from Letitia Eberhardt. We went to go speak with her in person. And when our investigators went there, our lawyers went there, they were met with Virginia State troopers. So we managed to get her deposition, at which point she said, I don't know what happened when I signed that affidavit. But in fact, we presented evidence at the hearing, Judge Wynn, that she actually reviewed her affidavit and made corrections to it. And that affidavit is now on the contrary to what she said at this deposition, review her affidavit and check it for accuracy. Let me ask you, the shoe is on the other foot. And the state had obtained an affidavit from a witness. The witness had made corrections on it. And then the witness came into court and disavowed all that testimony. Wouldn't you be telling us that we should rely on what the witness said? Your Honor, I'd say that you should look at what the witness said, because the witness did say also. But I gathered from Judge Wynn's question, what seems to me your essential problem is this incredibly difficult standard and credibility findings by the district court on a number, doesn't foreclose everything, but there are credibility findings on a number of issues. And we defer to those for sure. I mean, it doesn't matter whether you think he's wrong or we think he's wrong. He gets to determine credibility. And in light of that, it seems to me it's a really very difficult road you have to go here. And Judge Motz, I understand that there were factual findings that were asking for review under a clear error standard, but there's also an overarching legal error, I think, an analytical error by the district court. And that's something that I think this court can review de novo under Wolf. And that is that overarching legal error. The overarching legal error, Judge Motz, is that rather than conducting the sort of probabilistic, holistic analysis that Schlup requires, that is saying, in light of all the new evidence and the old evidence, I'm not going to review this record independently, House versus Bell. Instead, I'm going to determine what a jury would have done, taking all of this as a whole. Because what the district court did, Your Honor, was I think he looked at pieces of evidence. Yeah, but there was so much evidence. I think that's real equivalent with the district court. I mean, you know, I have a lot of sympathy with trial lawyers, but I also have sympathy with trial judges. He was trying to analyze all of the evidence. You have to do it some way. You can't just keep saying, it's holistic. But if he'd issued three pages that said, I've looked at all the evidence and my holistic analysis is X, then you would be saying that he should have looked in detail at every single piece of evidence. Well, Judge Motz, I think the reason that it's more than a quibble is just to use the example of the Gilkes affidavit. What he did was he said, I find these three problems with the affidavit, and therefore I'm going to take it off the table. I'm going to say that it's something that's not reliable. No, that wasn't the only reason he did. He also said that it's a recantation. And as my friend Judge Davis said earlier, it's really very difficult to understand what we're to do with recanted affidavits. I mean, you haven't cited just a case that does anything with that in this context. One thing we have cited, Your Honor, is this court's decision in Johnson, which says, view an affidavit with suspicion if it's the product of bribery, coercion, or other misdealing. And that wasn't established here. But the district court said at the outset, because it's a recantation, I'll look at it with the utmost suspicion. I think that was an error as well, Your Honor. Okay. I think you've exhausted your time. Thank you, Your Honor. Thanks so much. Good morning, Your Honor. May it please the court, Alice Armstrong with the Office of the Attorney General on behalf of the warden. Ms. Armstrong, first of all, can you speak up just a little? Oh, I'm sorry. Would it help if I- The old drag, Beth Alessa here. Would it help if I- And secondly, could we begin with where your colleague left off, where he was talking about, you know, given that there's no evidence of bribery, coercion, and misdealing that the state has introduced, how are we supposed to consider the affidavits? Well, if we can start at that point, what I would say is- Pardon me. What I would say is, and Mr. Tellegate has acknowledged this in the pre-hearing pleadings, the burden was his. The burden was his to demonstrate the reliability. And so the burden was his to show the circumstances under which these affidavits were procured, and he did not meet that burden. Mr. Gilks invoked his Fifth Amendment right, but the people who- I'm sorry. The people who took those affidavits, both of the affidavits from Mr. Gilks were members of Mr. Tellegate's legal team. And there's no suggestion that those individuals were not available to him at the hearing. Indeed, at least one of them was physically present at the hearing. When you have naked affidavits and nothing more, and then the witnesses do not come forward, and then you have testimony by others who support at least the perspective that the government offers, is it proper for the judge at that stage to view those affidavits with a so-called judge's eye? I think it is in this case because the representations in both of those untested affidavits was that the reason these witnesses allegedly testified falsely at trial was that they were coerced by the Commonwealth attorney who was present at the hearing, who did testify under oath, who answered every question put to her by both sides, and who flatly denied those affidavits. And the district court, having seen and heard that witness under the crucible of cross-examination, found her testimony to be credible. And likewise, Mr. Safanoff also said that not only the Commonwealth attorney had coerced him and made his promises, again, flatly denied, and that testimony was found to be credible, also alleged... Actually, though, for God, at least you started out as a divergent on the defendant. When you say they were represented as coerced, they affirmatively are coming forth with this to say, well, the initial testimony was coerced. But the affidavits themselves, at least from Wolf and perhaps even Johnson, seems to indicate that you can look at them in at least an unfavorable light initially, because they could have been, the affidavits themselves could have been the bribery. And so from that perspective, is that your argument that they did not come forth with evidence that would refute that the affidavits were not the result of this when they've given sworn testimony in the trial and appeared, but they're not appearing here? Exactly so. So under Johnson and pretty much all of the other case law from other jurisdictions, I try to avoid string sites, but I wanted to give the court some weight of the authority, is that really courts look on these with great disfavor because of the language of the Supreme Court of Virginia, this sort of obvious opportunities for extraneous influence coming in. And this court has said is particularly skeptical when it's a co-defendant, a co-conspirator, someone of that nature. And that's exactly what we have here. So the starting point is we look at these skeptically and Mr. Telugu's never came forward with anything to affirmatively show that we shouldn't be skeptical. Let me ask one last question, at least in that vein, because I wonder if we should view these cases, and I'm sure we should view them individually. This case takes on a very different atmosphere because of the almost has an international implications and with the different characters going across overseas and here. It's not house. I mean, house is a different case in terms of what's here. I understand that. But nonetheless, I mean, there's enough here. Is there enough to meet that threshold requirement in light of what the, at least the special circumstances, the international play? I mean, you got people overseas and you don't expect them to come back. I mean, why would you come back and face possible who knows what, even perjury in the first trial you could potentially deal with. And I see every participant saying, no, I'm not coming back over here and testify that I lied at the first trial. Why would anybody do that? Well, I guess two points, Your Honor. Mr. Telugu's almost until the eve of this evidentiary hearing assured the district court that Mr. Safanoff was going to voluntarily appear for a video deposition. Now, the district court was clearly skeptical. If you to get there, you would have assumed that he was misrepresented in the first instance, that he felt like they actually were going to come. He, in fact, could feel that they just didn't come. Well, he expressed- Unless you are implying that by their representation, they were misrepresenting to the court something they thought was going to happen. They didn't really think it was going to happen. Well, I'm not sure that I'm comfortable stating it quite that strongly, but I would note to the court that although the evidentiary hearing originally was set for June of 2013, the record discloses that Mr. Telugu did not make any effort to determine what procedures were available in Kazakhstan to secure sworn testimony until September. And so I would say he was not diligent in his efforts to secure the testimony of the witness that he told the district court he would be able to bring, if not physically, at least- I said one last question, but I do have one question. You just brought up something. Are you suggesting that you could have had something of an ancillary procedure in a different country, get his testimony, and that would have been received in the same way? Or maybe some other means of televised type or teleconference type videos or something of that nature? Well, I don't want to suggest something, because we always were concerned with how we would ensure that the witness really was Savnos, because none of us was at trial and don't know him. And what would happen if he simply walked away when we began our cross-examination? But the problem is, we don't know, and all of that was left to conjecture, because Mr. Telugu's never proposed to the district court precisely what he had in mind, other than there would be some type of video, two-way deposition. But beyond that- Well, the federal rules provide for such things. The federal rules do provide for such things. Apparently, the Kazakh rules don't, and- Yeah, but luckily, we're not conducting the trial there, or the hearing there, so we'd follow the rules here. So you could get a de bene assay deposition, I assume. And the district court granted him leave to attempt to do that, just as the district court granted him leave to conduct the de bene assay deposition of Letitia Everhart, and Mrs. Everhart disavowed what was represented to be her affidavit. So if we're talking about a holistic approach, a holistic- She disavowed what was represented to her, or did she simply say, I made some false statements in the oil, or this information is false here? She made some comment, and I don't remember the precise verbiage, Your Honor, so I don't- I'm paraphrasing. She said something during the course of the deposition that, while Mr. Teleguz's counsel was inquiring, something to the effect of, it looks like my signature, which brought counsel up short, and he said, what do you mean it looks like your signature? And she expressed the view that that wasn't her actual signature. Now, she did confirm that she gave an affidavit, but what she said was that the affidavit that had been presented to the court was not her affidavit because, and I think this is the quote, half the stuff in there isn't true. At that point, Mr. Teleguz's counsel went through the affidavit, the purported affidavit, with her, paragraph by paragraph, and she disavowed many of the actual statements that are asserted in the purported affidavit. That's important because what you seem to be indicating is her testimony, and I'm not sure the question was asked, but you said it, this was not her affidavit. Someone had put another affidavit instead of it and put her name on it. Is that what the- she didn't say it directly, but you certainly are a part of it. She did not say that, but I think that's the reasonable inference from what she actually did say, which is, well, I gave an affidavit, and this looks like my signature, but this isn't my signature because, and again, I think I'm paraphrasing, but something to the effect of, that's not even how you do an R, or, I mean, she was critiquing the actual signature, and so I think the reasonable inference is that certainly there was some question, I'll just say it that way, some question about the manner in which what was presented to the court was procured in that circumstance, and if we're doing the holistic review, then it's reasonable for the district court to take that into account when discounting these other affidavits that have no benefit of cross-examination, and the only other affidavit that was touched on regarding the circumstances was Mr. Millay, and he was wholly unable to really give any account for how his affidavit came to be. Ms. Armstrong, does the Commonwealth take the position that defense investigators are out of bounds from your discovery? I think that they would fall within the protections of the attorney-client privilege because they're... And so is there a difference, typically, in an ineffective assistance of counsel claim? The law deems the privileged way, right? And in every case in which child counsel or appellate counsel on direct appeal certainly is attacked through a post-conviction challenge, the Commonwealth and every state and the United States obtain affidavits from counsel and offer factual evidence to dispute the assertions of the defendant. So I'm curious to know whether your position is that that's different with respect to post-conviction investigators who obtain affidavits from former trial witnesses. That seems to be an asymmetry that the law would not particularly look kindly on. A couple of points in response to that. First, at least in Virginia, as a matter of Virginia law, the waiver is narrowly construed to only cover that which is any disclosures which are necessary to answer the claims. And more recently, the Virginia State Bar has issued a legal ethics opinion that very strictly circumscribes the circumstances under which defense counsel are able to cooperate with the Office of the Attorney General because that's generally... Of course, here you're in federal court, so issues of privilege would be decided under federal statute. They would, but the rules of professional conduct for members of the Virginia State Bar would still... They're certainly asserted, I can say to the court. And more specifically, to this case, Your Honor, my understanding is not that it was a defense investigator who procured these affidavits. And I may be wrong, but my understanding was that it was members actual... At least one of them was Ms. Pfeiffer, who's a member of the State Bar and a member of the legal team here. So I'm not certain, but those individuals, I'm not sure what Ms. Tripp's status was at the time that these were prepared, but my understanding at this point is that she is now a member of the Bar and now a member of that firm. So I don't think that that would have been available, an available avenue to us, but it certainly was an available avenue to Mr. Teleguz to explain the circumstances of how these came about. Well, but as I understand, Mr. Teleguz is resting on the face of the affidavit and the absence of any suggestion of coercion, et cetera. And it's kind of sort of a shifting burdens kind of a situation, isn't it? I mean, he put forward the affidavits and you, according to his argument, you didn't... The Commonwealth didn't point to anything on the face of the affidavit or any of the circumstances surrounding the obtaining of the affidavit to suggest a lack of reliability. What affidavits are we talking about? All the affidavits? The guilt affidavit, particularly. Well, I think it was our view that that information was not available to us because it was most pertinently available through the attorneys. He presented one of the former attorneys, Ms. Givens, to try to rebut Ms. Everhart's testimony, but none of the other individuals who procured those affidavits was called as a witness. And again, coming back to, we're starting from a point of skepticism because of the nature of this testimony. But in addition to that, Your Honor, I think it's important that there are factual allegations in here that purport to explain why they purportedly testified falsely at trial, but those allegations were flatly denied by witnesses who were present and who the district court found to be credible. And so when we're weighing live testimony that the district court was able to evaluate... These are the people, the prison people and the Commonwealth Attorney and also the Deputy United States Marshal, who Mr. Sassanoff alleged had promised him help with an S-1 visa, and the Deputy Marshal said he'd never even heard of such a thing until he looked it up on the internet in connection with these proceedings. It certainly was not part of his job, and he didn't know of such a thing. Again... Let me understand that. So you're saying once Mr. Goss and Nelson testified, refuted these allegations in the affidavit, then the defendant needed to boast of that or do something with the affidavit at that point, because credibility, determination by the judge is hard to overcome at that point in the standard that's articulated. Exactly so. And beyond that, again, coming back to my point talking about the burdens, the initial burden, the burden going forward, the burden to show that this new, purportedly new evidence is reliable, is on Mr. Telleguse. I mean, there's nothing in Shloop that suggests that the burden ever shifts to the prosecution. Let me ask the question, just as a clarification point. We're talking in terms of innocence, in terms of guilt or not guilt, but he was also, the jury, I think they rejected future dangerousness and took violence into consideration. And from a violence perspective, would this be evidence that would be very difficult for a reasonable jury not to reject that and not give it a death penalty? Well, one correction, the jury found both aggravators, both future dangerousness and violence. Well, I'm saying if there's a problem, future danger, let's assume it's violence. Okay, I'm sorry. Is this evidence that could be used to say that, you know, no reasonable jury could possibly have found violence if these things are taken into consideration? If I'm understanding the question correctly. And so the question is, if we take future dangerousness out of the equation, and we're only examining the question of violence, are these recantations sufficient to undermine our confidence in the finding of violence? Is that the question? To let him cross, pass through the gateway? I think not, Your Honor. And the reason why is because the witness who did testify is the actual murderer. And his testimony at the hearing before the district court was, and I do quote, Ivan Teleguz paid me money to go kill Stephanie Sipe. I went and killed Stephanie Sipe, and I came back and I collected the rest of my money. And that's at Joint Appendix pages 27, 98, and 99. So the fundamental tenant, and that coupled with, and Mr. Hetrick was very clear and unequivocal and reaffirmed all of his trial testimony. The district court found him to be a highly creditable witness, found that he gave the only complete and detailed account of the manner of death, which was the linchpin of the Supreme Court's finding that the violence factor was satisfied because by giving that direction and understanding what the physical consequences of that direction would be, that evidenced the depravity of mind necessary to satisfy the violence factor under Virginia law. So to follow up, if the merits of the future dangerousness claim was reached and decided favorably to Mr. Teleguz, would your argument be he's not entitled to any relief because of the violence aggravator? Well, I think the question about the violence versus the future dangerousness aggravator really animates the Martinez discussion rather than the Shloof discussion. And maybe the segue between those two points is that to the extent that this court's mandate may or may, to the extent that this court's mandate may have encompassed Martinez, and I don't think I conceded the point. I just simply said it was unnecessary to reach it because the court went ahead and discussed it on the merits. But didn't allow discovery or an evidentiary hearing, right? Well, but I'm going to quibble a little bit because the district court's order granting an evidentiary hearing said it was so that it could, quote, properly determine the reliability of the new evidence presented by the petitioner and taking this court's lead. And in addition, at page 1745 of the joint appendix, the district court said in an order, the hearing is granted solely to permit the petitioner to present such evidence not presented in his criminal trial that supports his assertion that he is actually innocent. So the district court several times stated the limited, its understanding of the limited scope of the evidentiary hearing. And Mr. Telgeuse waited until the morning of the hearing to alert the district court that he also wanted to present evidence on his Martinez claim at that as reflected in its opinion, was initially reluctant to hear that, but ultimately permitted him to present the evidence that he said he wanted to present via misgivings. So I'm not sure that it's fair to say the district court didn't permit him things. The district court was very clear as to what the purpose of the hearing was. And that's what this court suggested the district court do. In addition to that, I would say that the mandate, whatever its scope was conditional.  I'm not sure I know what you mean by some mandate, whatever its scope was conditional. What is your position on the mandate? We took the position below that it was that the Martinez claim was not encompassed within the mandate. And the district court agreed with you? And the district court agreed. And the district court said, but just to ensure there's no possible miscarriage of justice to present any possible miscarriage of justice. I'm going to consider it in the alternative. But not permit discovery on it. Well, I mean, is that correct? That's correct. No discovery was permitted. But there was a request for saying. Yes, and I think most of what he would have. I mean, there's no suggestion. Well, okay. No, I take your point and I don't think your argument is specious in any way. I think it's a good advocates argument. But the point is, seems to me we have a record that is incomplete. Under circumstances in which maybe counsel should have been more diligent in alerting the district court to the full expanse of the Martinez claim. And I suspect as an advocate for the Commonwealth. Frankly, you would have said, yeah, let's decide everything. Let's just decide everything on the merits. Well, but you know, I frankly, I don't know why. Why the states don't do that more often. What are they afraid of? To be perfectly fair to that penalty case. I decide everything on the merits federal district judge working like crazy to get it right. And to be fair, and let's just do it. You know, let's just do it on the merits. What was the representation about what sort of evidence they wanted to get in discovery? I honestly don't remember all of this. Was there a representation? There was a representation of what they wanted for discovery. But the post trial request had morphed it into some kind of Brady Giglio type of claim. And so I, as I'm standing here right now, I cannot honestly say, and I'm sure that my friend will be happy to tell you the precise scope. What about the, I thought you just said in earlier response to Judge Davis, that at the hearing, okay, first, the district judge said, no, I'm not going to consider it. And then it said, all right. And then a witness did testify. Is that correct? Correct. And that witness was? Miss Gibbons, who was one of the state habeas attorneys. And the district court. Who said we blew it. Well, who said. Paraphrase the testament. Well, she actually didn't say that because I invited her to say that the representation was poor. That they did not do a good job for Mr. Telecuse. And she did not say that. She said, I can only say I missed this claim. The one she blew. The one she blew. But there, I mean, the court is familiar with the record. There were numerous claims asserted in the Supreme Court of Virginia. I think it's important to bear in mind the framework in the Supreme Court of Virginia, which is there was a 50 page limit there at the time. They've since expanded that. But for purposes of this case, the page limit for his state habeas corpus petition was 50 pages. Mr. Telecuse has never suggested what claim was less meritorious that he would have dropped to reprioritize to fit this claim in. So I think when we're talking about experienced, especially trained, I mean, these attorneys are represented or, excuse me, appointed pursuant to statute in Virginia and must have special training. And these are experienced attorneys. And she conceded that she was an experienced attorney. And she had done state habeas in death penalty cases. She agreed that she was combing the record for the claims that would most likely be successful on state habeas. And so when you're an expert and when you are reviewing these things with that trained eye, certain things come to you more readily. And under Jones- Every time one of us writes a dissenting opinion, we're effectively being reversed, right? And I might say that about our superiors as well on First Street. A dissenting opinion is a reversal by the majority, isn't it? I guess. I mean, we all work hard. Lawyers and judges, we all work hard. We all do. On both sides. And- And we all get it wrong. It's a human endeavor, but which is why perfect representation is not required under Strickland. Point taken. We don't require perfection even in these cases. But in a death case, we want to get as close as we- We most certainly do. And that's why we appoint specially trained counsel. That's why Virginia has- I'm going to ask you on this Mosley's claim. I'm sorry. You brought up the Mosley's claim. Which one is it being alleged to be that the counsel was ineffective? Is it the raising and the opening of the door on the record of patients in America? No. That's not the claim. That's never been the claim. The claim is not that the attorney was ineffective for asking the question and injecting something that actually he had successfully moved in limine to exclude, at least in the guilt phase. The claim is that the trial attorneys, having done that, were ineffective for not rebutting in the penalty phase. And even if it is, then that would go to the future dangerousness. Alone. And still have power. Exactly. And because of that, and because ultimately this is a Strickland claim, or a Strickland claim once removed, it's a double Strickland claim, I guess, under Martinez, we have to put ourselves in the shoes of what would the Supreme Court of Virginia have done with that particular claim. And under Hedrick versus the warden, which we cited on brief, the Supreme Court of Virginia would say, you can't show prejudice because there's this other fully sufficient aggravating factor, which was affirmed, directly attacked on direct appeal and affirmed on the direct appeal by the Supreme Court of Virginia. That was what was challenged. You don't mean to suggest to you, or maybe you do, if there are four aggravators alleged, and ineffective assistance of counsel results in three of them remaining in the case, and not being taken out of the case, with one remaining, that a petitioner raising such a claim is not entitled to relief. And I used three, but I could use five. Sure. And here it's two. Here it's two, and we're questioning, can it stand on one? And it certainly can stand on one, because we do have cases in Virginia, reported cases. I believe the gray case that some members of this panel heard yesterday, there was only one statutory factor, I believe, that the jury found in that case. No, but we're talking about a situation where there is one viable one, that is one not tainted by ineffective assistance or a Brady violation or something. Correct. But there are others in the case that should not have been before the jury. In other words, what's the marginal cost to a defendant in a death case that there are two or more grounds for death? Well, I think we do. How has the Supreme Court told us to assess that? They've told us to assess that under Sawyer, that the petitioner must come forward with clear and convincing evidence, the higher standard under Sawyer, that the statutory aggravator doesn't apply. And even under the best circumstances, as a substantive matter, whether or not that testimony was rebutted doesn't make the aggravating factor unavailable. It's not a situation where an element of that factor couldn't be satisfied as a matter of law. So, for example, under Atkins, if the petitioner makes a proper showing that he is intellectually disabled, it does not matter. He cannot be, he is not eligible for the death penalty. But this is a different class of evidence. This is just simply rebuttal of that. It doesn't eliminate an element. In other words, they might still be asking for consideration of that factor, but they would have rebuttal evidence which the jury would accept. Which the jury would hear and may or may not accept because I quibble with. I quibble with the representation about what the number one argument for future dangerousness is, but I see that my time is expired. And I, unless the court has other questions of me, I would ask the court to affirm the district court's findings and holdings. Thank you, Your Honors. Thank you, Your Honors. In rebuttal, I'd like to make four points. I'd like to start with the procedural point about Martinez. It was one of the last issues that was discussed by my colleague. Just, I'd like to dispel any notion that there was some sandbag with the district court on Martinez. In post-hearing, post-remand briefs on remand from this court, we alerted the district court that under Martinez, we were entitled to an opportunity to present argument and evidence demonstrating that there was cause and prejudice in post-conviction counsel. I don't have the date of that brief, and I apologize for that. But it can be found at the docket, on docket 120 at 29 to 30. So we filed briefs with the district court before that. And then on the first day of the hearing, we showed up and said, Your Honor, we plan on presenting Martinez' evidence. The judge said no. The warden said beyond the scope. The judge said no. And it wasn't until we made a convenience argument when we brought Jenny Givens to the stand, Jenny Givens was post-conviction state habeas counsel, that we said to the judge, Judge Davis, it's your point. Your Honor, we have the witness right here. Why make us do this again? Can we ask a question about this? And then he reluctantly allowed us to do that. But we weren't allowed to develop the arguments or the evidence until I think she was our second to last witness at that hearing. Now, turning back to Ms. Givens, I'd like to talk about the process in this case. Because there seemed to have been this suggestion that this case was really about... Are you leaving the ineffective assistance claim? Not if you'd like me to go back there, Judge. Okay. I wanted you to address what the state lawyer said at the very end when we were discussing, suppose you could have... What's your position with respect to the use of this evidence with respect to one of the factors, but not another? Yes, Your Honor. And so I think... And I don't think it abolishes the state's ability to ask the jury to find either factor. Right. I mean, you have your evidence. State has its evidence. Jury decides. That's right. I think... And Judge Motz, please let me know if I'm misunderstanding the question. But it's, does the vileness aggravator that the jury found provide an independent basis that sustains the capital sentencing? Because what we're presenting is evidentiary and constitutional problems with the future dangerousness aggravator. And on that point, we've cited the Brown versus Sanders case by the Supreme Court. Where the Supreme Court, it was affirming a conviction there, but it said, if you can get the same facts in under another legal rubric that's not tainted, then the independent... But you're talking about tainted. We don't know that the jury would have accepted your argument, even if all that evidence had been in. The jury might've still found that that factor apply. That is that... So it's not in the, to me, in the category of tainted. It's in the category of disputed. Disputed, understood. And we've also raised arguments below Judge Motz that the prosecutor couldn't have made this argument with no evidentiary basis in fact, or that... And I'll just add on the... I don't want to take up any more of your time. No, I'd like to answer your question, Judge Motz. And I'd also add there's that Tuggle versus Netherlands case, which actually involved Virginia State Courts. I believe it's the Supreme Court from 2005. There, it's a slightly different issue. And again, they affirmed a conviction. But there, I think one of the aggravating factors wasn't viable. And so the Supreme Court said in that particular case, that is, it wasn't constitutionally impermissible. It wasn't tainted. It wasn't disputed. It just wasn't a factor that could be considered by the jury under more recent precedent. And so in both of those cases... Yeah, that seems different to me, but go ahead. It is, but I'm just trying to round out the answer. And I don't know if Your Honor has other questions on Martinez, because I was going to go to Schlup. Because on Schlup, there was a lot of discussion about the burdens. And on that, I'd like to make two quick points. I mean, the first is, Judge Motz, we talked about the burdens. And the burden isn't as high as Herrera. This isn't an argument that Mr. Teleguz was actually innocent, and therefore can't be constitutionally sentenced to death. It's a more reasonable than not showing that no reasonable juror would find him guilty. The warden talked about how the burden was on Teleguz, and that's true. But Judge Davis, this goes to your point about hardworking district courts and hardworking lawyers. I mean, what we had was we presented these affidavits, and this court raised the question, determined whether they're credible or whether coercion, bribery, or misdealing. Every time the warden raised some question about whether or not an affidavit was true, was accurate, was valid, we demolished those claims at the hearing, Your Honor. And just to give you the example of Ms. Everhart, and to round out, since Your Honor's had questions about it, Ms. Everhart submitted her affidavits where she said she was definitely sure that Mr. Teleguz wasn't present at this party. We went to go meet with her. We were met at the door, as I'd mentioned, by state troopers, and then she refused to speak with us. So we got a deposition. And at her deposition, she didn't say Ivan was at the party. She said, I'm not even sure it was my deposition because half the things in there weren't true. And maybe Mr. Giltz, my brother, could have let him in through another door, and he could have gone upstairs without my seeing. So she equivocated there. So what did we do in response? We brought the lawyer who took the affidavit, and she testified about its preparation and about the review. We called the investigator who initially spoke with Everhart, and he testified during that initial meeting. She said she definitely didn't see Mr. Teleguz. So there seems to be this question about whether we properly- Let's talk about, since you brought up that you brought, did you also bring in the people that got the affidavits from the two co-defendants? Yes. As a matter of fact, Judge Motz- And they each testified? They didn't testify, but Judge Motz, if we thought that this was just about authenticating evidence, then we would have put in that evidence. Schlup is about something very different, which is why the Supreme Court and Schlup- Well, you know that we were, I think, in a puzzle on how to deal with these affidavits that are contrary to the testimony at trial, and the witnesses have now refused to stand by those affidavits. So it seemed to me that it would be helpful to you in proving that, by God, they did stand by them at the time, and they are true. Whatever evidence you had with respect to that, and since you were able to put in witnesses that were there taking other depositions, other affidavits- That's why what I was trying to explain to the court was, every time an affidavit was questioned, we presented the people- Well, we know for sure that these affidavits were questioned. The state wasn't agreeing with what they were saying. Your Honor, they were questioned as to their substance and their reliability, but they weren't questioned. There was never an allegation that they were a fabrication or that they weren't authentic. And I will say, Your Honor, the person who took Mr. Gilkes' first affidavit is sitting at counsel table right now. She was present during the hearing for the entire time. There hasn't been the hint of a suggestion that there was any bribery, coercion, or misdealing in taking that affidavit. And with respect to Your Honor's puzzle- Tell me what misdealing is. Does misdealing have to be on the part of the person who gives the affidavit, or does it have to be on- Can it be on that part of that person? Your Honor, I'd say it could be- How would we know that? I could say as broad as the court wants to describe it. The way that you know that is that this court sent it down to the district court for a hearing. Indeed, and I've looked, and that's a classic thing that courts talk about, but I'm not so sure that the misdealing couldn't be on the part of the affidavit. But Your Honor, there's been no evidence of that either, and that's why- Well, there's the evidence that they're not standing up for it now. That's pretty good evidence. No, it's not, Your Honor, and here's why. It's not because you don't think it is, but there's another point of view that it is. No, Your Honor, I'd say the reason that it's not is because there's an alternative explanation for why they're not standing up for the affidavit. Yes, there are two explanations for it. One, it wasn't true, and two, it was true, but they're scared. Yes, Your Honor. Okay, we have those two explanations, but there is one explanation- So, Your Honor, with respect to the first explanation, that it's just not true, there's no explanation as to why he would give that testimony at great personal risk in the first place. There's no, you know, to use Judge Jones's phrase, there's no complete and consistent theory of why he would submit that affidavit. Then on the other side, the reason, you know, the answer to the puzzle that we're offering is he was threatened by prosecutors, he lied because the prosecutors- Prosecutors, though, came in and did testify and were subject to cross-examination, and the district court credited them. Then we have to defer to that finding. And, Your Honor, this is where, as I mentioned, I'd had a rebuttal point on process. The prosecutor was cross-examination, but we weren't allowed to take discovery. We asked for basic documents, notes- You got no documents on the prosecution at all, or you got some? We got- We got- We had the trial case file where there were some documents that were- That include interview notes? That did include interview notes, Your Honor, but then we asked for things like communications between the prosecutor and the U.S. Attorney's Office in Massachusetts regarding Sopinoff. We asked to- We asked for the U.S. Attorney Sopinoff documents related to the Telegos investigation, so we asked for other categories of documents that would have been necessary for fair cross-examination. Is it your position that in order to be fair, you had to obtain every piece of evidence that you asked for in discovery? Of course not, Judge Miles. But- But- I mean, this doesn't- I mean, in every case that I've ever tried, no party gets everything they want in discovery. I've never tried a case where that was so. And, Judge Motz, that's all true, but that's not what we're asking. What I'm saying is, as Your Honor pointed out, there are two alternative theories here. On the one hand, the prosecution can either attack Gilkes' affidavit by saying, he's just wrong, he's just lying, he's just making it up. Or they can say there was some sort of misdealing and there was coercion or something was going on and it's not really the truth. As for that first, that wasn't even suggested. And, Your Honor, if there was even that allegation, we would have demolished it at the hearing. As I said, the person who helped prepare that affidavit is sitting at council table today. As for the second, that it was just wrong? If it was wrong, then how do you explain why Gilkes would say this in the first place? How do you explain all of the corroborating evidence that's independent of Gilkes? And that's part of the problem here. I think that's why there are these lingering doubts about Mr. Telegos' conviction. There was no reason for Mr. Gilkes to say, I lied. He's still in a Virginia prison. He was subject to these threats by the prosecution before the hearing. And then he took the fifth. And this is my point on the burden judgments. Because he took the fifth in response to my questions. From when I asked him, what's your name? But the Commonwealth wouldn't have exposed him to further jeopardy by asking him, was there some misdealing? Tell us about what happened with your affidavit. Was it true? They could have asked those questions. And had they asked those questions, Your Honor, we could have moved and said, this doesn't expose him to any greater jeopardy when it's coming from the Commonwealth. So there are lots of things. There was talk about burdens at the hearing. And Judge Motz, you asked for this representation that we brought all the evidence we could. And Judge Wynn, you talked about the international component to all of this. I can say, if you're going to hold Mr. Gilkes refusing to testify at this hearing against somebody, it wasn't Ivan Telegos that told him that he'd be subject to a capital murder prosecution if he doubled down, if he affirmed what he stated in his earlier sworn testimony. It would have been more useful, perhaps, if, well, maybe they'd run into a Wolf type problem if they got a counter affidavit before all of this blew up. I mean, I don't understand, it seems to me, if I'm a prosecutor and I've cut this deal in a death case with the guy, and then post-conviction counsel serves me with an Why would you wait four years, five years, and then on the eve of the hearing go to the judge and say, appoint a lawyer to him, who we all know is going to say, don't you dare take the stand and say a word? Not a lawyer in this room would say anything other than that. Judge Davis, I think that's exactly right, and that's part of our frustration here. Because in the warden's argument about burdens, the warden said, it wasn't our burden, we didn't have to produce any evidence. But this court instructed on the remand, you've got to have this heightened sensitivity in a death case. And we'd submit. The warden couldn't just say, it looks like we're ahead on points, and so we can just wait until the clock runs down. But as this evidence was available to them as well, we think we met our burden on the facts. We think there's no reasonable explanation for why Gilks would say in his affidavit what he said with the level of detail that he said it, except that it was the truth. Mr. Williams, your time has expired, but we've taken episodes. Do you have a concluding sentence or two? The concluding sentence would be, I started out by talking about the effort of murder, and how Mr. Teligus was sentenced to death based on this evidence elicited by his own counsel, murder that never actually occurred. That's a significant enough, a substantial enough constitutional deficiency that we'd ask this court to reverse the district court. And I thank you for your time. Thank you very much. We'll go down and greet the lawyers, and then go directly to our next case. Mr. Williams, I understand you're court-appointed. You've done a fine job for your lawyer. We very much appreciate your effort.
judges: Diana Gribbon Motz, James A. Wynn, Jr., Andre M. Davis